Good morning, Your Honors. Robert Gerstein for Petitioner Appellate. Your Honors, we were before this Court five years ago, and at that time this Court directed the District Court to hold a full and fair hearing on two of Petitioner's claims. We are back here today, five years later, because Petitioner still has not had that full and fair hearing. The District Judge, in some large and egregious matters, as well as some less striking but still crucial matters, refused to hear relevant material testimony for no good reason. And under those circumstances, as the Supreme Court said in the Inwood Laboratories case, the appropriate course is remand for further proceedings to allow the trial court to consider the evidence. In short, given the truncated character of this hearing ---- Counsel, may I ask you, you mentioned remand. Assuming that Judge Reel did abuse his discretion, and I'm not making that assumption at all, before remand, do we have to do a harmless error analysis? Yes, Your Honor. Yes? Yes. Do you have any case to assist me in that? Well, Your Honor, the cases with regard to remand for failure to hold a complete hearing, for failure to hear substantial evidence, do not seem to include any harmless error analysis. So it looks as if, if there is simply an incomplete hearing, a failure to do what this Court instructed the District Judge to do, that there is no need for harmless error analysis in that context. Mr. Christine, I'd like to take this from the general to the specific. Yes, Your Honor. We remanded specifically on two claims. One had to do with whether or not the prosecutor and the investigating homicide detective had basically intimidated Michael Taylor. And the second was the question of the adequacy of the pretrial investigation by the defense on mitigation evidence. And is it your argument that Judge Reel failed to give you a full hearing on both of those claims, or just one of the claims? No, we are arguing that we did not get a fair hearing on either claim, Your Honor. All right. And specifically, let's take it claim by claim, then. Yes. We specifically said in our opinion that the Court needed to assess the credibility of Michael Taylor, and the only way that could be done would be to actually hear the testimony of Taylor, Fultz, and Mielke and make a credibility assessment. And the district court did that, did it not? It did, Your Honor, but Petitioner also put forward another witness relevant to credibility. And that was in Dozier. But you did the same thing about Ms. Dozier the last time you were in front of us. And, in fact, in reading the State's pleadings before Judge Reel in response to your in limine motion, the State points out that you never appealed the Dozier issue when you were up before us the last time. So why shouldn't we, first of all, decide that that issue has been waived and, secondly, rule that there's no abuse of discretion given the scope of the remand in excluding the evidence of Ms. Dozier? Well, Your Honor, there was a claim related to Ms. Dozier. That was not appealed. However, Ms. Dozier's testimony was also relevant to the claim with regard to Taylor. That is, she was a witness whose testimony could impeach the warden's evidence. And why did the district court err then under Rule 608B in excluding proof of extrinsic evidence of the Dozier incident when you never cross-examined Mr. Foles on the issue when he was on the witness stand? You never laid the foundation for the impeachment. Well, Your Honor, we would contend that even so, she should have been heard. She should have had an opportunity to speak. It's clear that there was error in excluding her testimony. Well, I'm not so sure that it's so clear if you fail to perfect it. I mean, you've known about Ms. Dozier since the time of the trial. And here we are, what is it, 22 years later? I'm a little bit at a loss to understand sort of your shifting theories here. Well, Your Honor, it's really not a different theory with regard to the Taylor matter. The contention is that Taylor told the truth, that Foles and Mielke did not. Ms. Dozier was there in order to show that there was a pattern of the kind of intimidation which Mr. Taylor was asserting. But isn't that propensity evidence under 404B, which the rule expressly precludes? Well, Your Honor, again, I wouldn't say simply propensity, because what – Well, you argued impeachment. Yes. And now you're arguing propensity. So it's either 404B or 608B. Impeachment in showing that in this particular context, in the particular – in this – in the context of this particular trial, not general propensity, but in this particular context, that there was a pattern of intimidation of witnesses. But that's propensity. You want to show that Mr. Foles, as the deputy district attorney, had the propensity of intimidating unfavorable witnesses that he thought were harmful to his case. Well, isn't that specifically excluded? Well, Your Honor – By the first sentence of Rule 404B. I should say, Your Honor, our contention would be, and I would leave it at that, that we have here not any kind of contention that he had a general disposition to engage in this kind of activity or general propensity to do so, but that what we see here is something that goes to his intent, his pattern, his operation in this particular case. You can't evade the rule by redefining the words. I mean, it's either propensity or it's not. And if it's not propensity, I would agree with you. It might be relevant to show intent or plan if that is truly an issue. But you offered it for impeachment as propensity. And maybe you can get back to my question under 608B. Why did the district court err when 608B specifically says that extrinsic evidence is not admissible, and particularly where you didn't lay the foundation for the impeachment by asking Mr. Foles to confront him? Your Honor, I would just – I would simply say our contention is that there was a showing of intent and plan in this context.  This is your question. Will you answer my 608B question? Well – Why is it error when the rule specifically says it's not admissible? Your Honor, I have no further answer. All right. Very good. Would you like to move on to a different issue? Yes, Your Honor. I would like to move on to the ineffectiveness at the penalty phase. As to that, there were many things on which the district judge refused to hear testimony – rejected testimony without good reason. The most egregious case was the case of the neuropsychologist, Dr. Munguio. This court prominently talked about her report and the trial judge hearing her testimony in its opinion. Despite that, the district court sustained – first sustained an objection to the conclusion of her report and then struck her testimony. There was no justification for doing that. If we look at the reasons which the district court gave for making that decision, none of them can withstand the light of day. What cases are you relying on in this argument? Is it the Correll case or what cases – Well, certainly, yes, Your Honor. Correll is one of them.  Jones is one of them. Each of those cases make it clear that neuropsychological testing is appropriate for determining organic brain damage. The district judge here said, well, she's a neuropsychologist as far as I'm concerned. She's not qualified to give evidence on organic brain damage. Well, Your Honor, if you look – yes, as Your Honor said, at Correll. If you look at Bean, if you look at Jones, what you see there is specifically that it is neuropsychological testing which is appropriate, and the failure, the inadequate failure to have such testing where there are indications of organic brain damage such as head injury and early and extensive drug use. And we have both of those elements here. The failure to have neuropsychological testing in the face of such indications of potential organic brain damage is ineffective assistance of counsel. Mr. Gerstein, what do we do with the fact that the defense engaged three different mental health professionals in 1991 – or excuse me, at the trial to prepare for the trial, and that none of them opined that there was any evidence of organic brain injury? Well, Your Honor, of course, none of them was a neuropsychologist. And none of them engaged in neuropsychological testing. The part of the responsibility, as the Cairo case said, as this Court said in Cairo, is to – for the – for defense counsel to make an appropriate investigation to determine what the right experts are. There was a failure to do that. The defense conducted extensive investigation into Mr. Earp's family background, drug use, medical history, and that that information was turned over to the mental health professionals. Are you basically saying that death penalty counsel must be competent in mental health issues so that they would see what a mental health professional did not see in the face of the investigation that was done? Not entirely, Your Honor. I mean, there is – we have the testimony of Strickland counsel and of Ms. Morrissey, who was Petitioner's first attorney, saying that in their understanding as of the time of this trial, defense counsel in capital cases, in fact, did understand that where there were these indications of organic brain damage, such as heavy drug use, head injuries, that you get testing for organic brain damage. But beyond that – I'm not sure that answers the question. I mean, if they hire three mental health professionals and they provide them with the underlying data, the social and medical history of the client, I guess at that point, whose obligation is it to decide that further testing needs to be conducted? I mean, isn't that what you're relying on the experts to say? Well, to an extent, yes. What we're saying is that the defense counsel also has to make an informed judgment. However, if we look at the record here, what we do see is that Dr. Gamson was the psychologist originally retained by Marshall Morrissey. And he made a report. And we have in Exhibit 94 in this map the notes which Ms. Morrissey made of his report to her. And he said that he did not find any organic deficits, but he said that he may want to do it for completeness. That is to say, it appears that he was telling her that his work was not fully complete and that it would be appropriate to look at the question of whether further testing should be done on organic brain damage. And, of course, this Court has said that there is a sacrosanct duty to conduct a full and complete mitigation investigation. Counsel, in light of Dr. Maloney's report that he found evidence that Mr. Earp was a sociopath and that he might have a proclivity to engage in acts of child molestation, coupled with that report, how do you square the Supreme Court's recent pronouncements that there comes a point where counsel has to draw a line in the defense investigation and not get so distracted by following every rabbit path down to its hole and instead must concentrate on other aspects of the defense that may prove more fruitful? Well, here, Your Honor, I think we have to put these two things together. First of all, we have this statement from Dr. Gamson that really the investigation with regard to organic brain damage is incomplete. And secondly, we do have this evidence from the cases from this period and from Morrissey, as well as from Strickland, the Strickland expert, to the effect that organic brain damage is something very significant to investigate. Mr. Gerstein, you're not answering my question. My question is what does a defense lawyer do when he's got opinions from three different mental health professionals, one of which is your client doesn't have an organic brain problem, he's a sociopath. At what point would we draw that line and say, well, let's devote our time and energy to other areas besides this one? Well, Your Honor, there is no evidence that Dr. Maloney actually said that there was no organic brain damage problem, but we don't have any evidence with regard to his view on that matter. We do have Gamson's statement that he didn't find it, but that he didn't do a complete job. And what report did we get from the third defense? We don't have anything with regard to organic brain damage there. And he was a psychiatrist, of course, and certainly that was not his area. Organic brain damage was not his area of expertise. So we have one psychologist saying not complete. Ms. Morrissey said her understanding was that the investigation was not complete in this respect and her expectation was that this would be followed up on. And her understanding, she says, as of the time of the trial was that defense counsel having this kind of evidence of organic brain damage and certainly having this kind of a statement from an expert saying you may want to do this for completeness sake, would in fact complete the job, would in fact investigate. Organic brain damage is not just some implausible path to follow in terms of investigation. It is, we see from these many cases, a number of which were already cited and which are cited in the briefs. It's crucial. It's something that you do consistently, that this Court has said again and again, may have a very significant impact on the jury. Don't you usually do it after there's been some admission, which would then put this in the nature of mitigation? And on this record, have we gotten to that point ever? Well, Your Honor, certainly we are dealing with mitigation here. We are at the penalty phase. And the question is, can we mitigate here? And what we see in particular is that the kind of organic brain damage, which Dr. Munguio says was present here, had to do with the executive function, not just intellectual capacity, not principally intellectual capacities, although she said some of those were degraded as well, but the capacity to exercise sound judgment. And at this point in this matter, what do you say this Court needs to do? This Court, Your Honor, needs to send this back to a new judge to hold a full hearing, because what we've got here is egregious error. And I might say in this context, if we look at this as evidentiary error of an egregious sort, which was made by this district court, then if we look at it in terms of whether that error was harmless or not, the burden falls on the party asserting harmlessness under the Obrey decision from this Court. The burden falls on the party asserting harmlessness. That is to say, the warden — But an examination today determined what the situation was 22 years ago. Your Honor, the expert, Dr. Munguio, said that it would. That is to say that because there's no evidence of any brain injury, any head injury between the time of the trial or even since Petitioner's childhood to this time, given the fact that we have the evidence of the early head injury, we have the evidence of the early drug use, that, yes, the same result would have been brought about. That was the statement in her report. That was the testimony she was prepared to give. Was there any investigation into his subsequent history from 1991 to the present to rule out any suggestion that he might have suffered the injury after the critical date? Your Honor, what we can say is that there is no evidence of any head injury since then. Well, that's not my question. My question is, have you looked? Has anybody pulled his medical records from his incarceration? Yes, absolutely. To see if he suffered any — if he was attacked in prison or — Yes, absolutely. Your Honor, there was, in fact, a full investigation of his medical records throughout his life to the extent that they existed. That was done, and there was no evidence of any further injury. I read Mungillo's testimony, but I didn't see any question along those lines posed to her at the hearing. So how did Judge Reel know that? Well, she was asked whether she — whether there was any evidence that she had been given of additional head injuries, and she said, no, there wasn't. She didn't — she — as far as she knew, there wasn't any additional head injury. Of course, she also acknowledged that she'd never talked to the three mental health professionals that were engaged in 1991. Is that right? That's true, Your Honor. But she did read the material, all of the written material that was in the record. And critically, she gave this extensive battery of neuropsychological tests of which are the best means of determining whether there was any brain damage. And she concluded definitely that he had organic brain damage. Is that correct? She did, Your Honor. In her deposition, certainly, she flatly diagnosed him with organic brain damage and would have been prepared to do so on the stand if her testimony had not been so abruptly terminated. If we were to remand, how narrow should the remand be to completely go back and say you didn't obey our orders? Should it focus on her testimony? What kind — and I'm — this is pretty hypothetical because there is no indication that we will remand. But if we were, what kind of remand are you asking for? It goes back to Judge Paris's question. Yes, Your Honor. We would ask for a remand certainly with regard to the whole claim of ineffectiveness at the penalty phase because while, as I said, the refusal to hear Dr. Munguia was the most egregious error we find here, the record is riddled with such errors. In fact, I mentioned testimony from Ms. Morrissey and from the Strickland expert with regard to organic brain damage and neuropsychological testing and so on. The district judge, in fact, sustained objections to those particular pieces of testimony. And again, we contend for no good reason. So throughout the hearing, there was a denial of the opportunity to present the evidence which could have proved this claim. So we would contend that the whole claim should go back to another district judge. If we did not remand, would we be able to consider her oral testimony before Judge Reel if we decided not to remand and we were going to go on the basis of the record that we have? He struck her entire testimony. Can this Court consider that testimony? Well, Your Honor, once again, in the Inwood Laboratories case, the Supreme Court said that the appropriate thing to do when a court refuses to hear testimony is not for the appellate court to decide the factual questions, but to remand. However, I should say we have contended certainly that with regard to the drug evidence, in spite of the fact that this judge refused to hear a great deal of that testimony, there's still enough there to justify granting the relief on the claim. And I would say there's probably still enough there with regard to Dr. Mungillo's testimony as well. However, I would have to say that to decide against Petitioner on the basis of the not only was her testimony stricken, but it was truncated. She was not allowed to testify to the extent that Petitioner's counsel had intended to have that testimony. There's one more question. Could we consider Cindy Dozier's declarations if we did not remand? Well, once again, I would say, you know, probably the appropriate thing to do is to remand. However, if this Court wishes to consider those declarations, certainly we feel that they make it clear that there was a pattern of intimidation here and that that pattern should be taken into account in deciding credibility. I see I have just a couple of more minutes, and I will reserve that time. Thank you. Very well. Thank you very much, Mr. Griffey.  Good morning, Your Honors. Supervising Deputy Attorney General Bill Bilderbach on behalf of the Warden of San Quentin. Beginning with the Michael Taylor claim, the prosecutorial misconduct claim, this Court was very specific about the testimony that it wished the district court to take. It wished the district court to take the testimony of Michael Taylor, Robert Fultz, and the investigator Edwin Mielke. The Court took the testimony of those three persons, made credibility determinations about those three persons. Specifically made credibility determinations about Michael Taylor, and more specifically that Michael Taylor was lying. And the witness that Petitioner's Counsel is discussing would have done nothing to bolster Mr. Taylor's testimony. She wasn't in the room at the time. She didn't even know Mr. Taylor. So his credibility, which was zero, would have been in no way enhanced by the additional proper testimony. So to the extent that we are discussing harmless error analysis for the purpose of remand, I think we can safely say that even if Cindy Dozier completely undermines, which is unlikely, but assuming that Cindy Dozier completely undermines Mr. Fultz's testimony, it does nothing to bolster Mr. Taylor's testimony, nor does it do anything to undermine Mr. Mielke's testimony, both of whom the district court made independent credibility determinations. Counsel, do you have any cases that discuss harmless error analysis in this kind of situation? No, I don't, Your Honor, unfortunately. I couldn't find anything, nor could my clerks. I wondered if you had found it. I would say that this is, notwithstanding the adjectives that Petitioner's Counsel chooses to use, this is a relatively routine case of purported error in the admission of evidence. And I would say that the typical rules that apply to errors in the admission or preclusion of evidence would obtain here just as they would anywhere else. So I would say that this Court should review those evidentiary rulings for clear error. But is your argument, because of the fact that Judge Reel made independent and unrelated findings of credibility as between Mielke, Fultz, and Taylor, that even if Fultz were completely impeached, you still have the testimony of Mielke, which the district court found independently credible, that there were no threats made to Michael Taylor at the central jail when he was interviewed? That's correct in part, Your Honor. Also, I would point out that the district court examining, and I think if the court were to return its attention to the district court's order, the district court said, I've looked at Mr. Taylor. I watched Mr. Taylor testify. I find Mr. Taylor to be devoid of credibility. And on that basis alone, I am compelled to reject this claim. Then the court turned its attention to the two responding witnesses who testified essentially because this Court had requested that their testimony be taken. But frankly, Respondent would have been entitled at the conclusion of Mr. Taylor's testimony, because it was my opinion that Mr. Taylor was devoid of credibility as well, to simply fold my arms and go home. So the notion that somehow the impeachment of a responsive witness to a person who has already had zero credibility with the court is somehow going to undermine the determination that the thing that they're alleging happened, happened. I think I'm getting myself bound up here. I apologize, but I think the Court's following my point. My question, I think, is pretty simple, and maybe it is a harmless error analysis. I hadn't quite thought of it in that respect. But without regard to whatever it was that Fultz said, there's no attack on Mielke's credibility by either Dozier or, well, I guess there is as to Taylor. Yes. Taylor and Mielke told irreconcilable and inconsistent stories. Yeah. So I guess my position, our position would be that, for one thing, you would have to stretch Cindy Dozier's testimony much more greatly than I think it's appropriate under the circumstances. But the best you could say about Cindy Dozier's testimony is it completely impeaches Bob Fultz. That would be sort of optimal for Petitioner. So that makes Bob Fultz a zero. It doesn't add anything to Mr. Taylor's credibility. It doesn't add any likeliness unless the district court would, as Petitioner's counsel seems to wish, use that as propensity evidence to somehow prove that the thing that Michael Taylor's talking about actually happened. But as the Court's noted, I think, several times in its questioning, that would be an inappropriate use of that testimony. If we're going to, as they say, limit it to the purpose of impeaching, then we're going to limit it to the purpose of impeaching. And if we're going to do that, all we can do with that is say that it negates Mr. Fultz's testimony. And again, we do have cases under 608B that say that it is subject to an abuse of discretion standard when a court excludes extrinsic evidence that's offered for purposes of impeachment. Yeah. And I think particularly when you're dealing with extrinsic evidence of unrelated incidents. I mean, we've got United States v. Hinkson is the embanked decision that we handed down last year that specifically addresses 608B. I believe you, Your Honor. Well, I was the trial judge. I know that case very well. So if the Court, with the Court's permission, I'm going to turn my attention to the ineffective assistance of counsel claim. There's a very telling comment, I think, that is made in the appellant's opening brief in this case, where they complain that what Judge Reel did here, and I'm going to read it. It says, Having decided to focus not on what trial counsel could have but failed to find, but only on what trial counsel did in fact find, the district court concluded that there was no ineffective assistance of counsel in denying the claim. And they're saying that was a mistake. And I think that they're accurately characterizing in part what the district court did. But I don't think there's anything wrong with that. Because Strickland v. Washington tells us that the question in the first instance has to be an examination of what trial counsel did in the first instance. And then we assess what trial counsel did for reasonableness. And if what trial counsel did was reasonable, that's the end of the inquiry. And here, there's no question that what trial counsel did was reasonable. Well, counsel, one of the mental health experts indicated that possible further examinations should take place. And then we have Dr. Monquiel, if I'm pronouncing that correctly. She definitely diagnosed Mr. Earp with organic brain damage. Well, let's be clear about the context of that, Your Honor. I'm sorry, did I interrupt? Well, I'd like to finish my question, because I want to get to the pinholster case, which you and Judge Tomlin are very familiar. I have some familiarity. The petition for cert has been filed as of March 8th. But in that case, it definitely said that brain damage, although it would not be connected to state of mind, that it would be a humanizing and, therefore, mitigating factor. Putting all that together, now my question is completed. This is what worries me about her testimony. Would you respond? Absolutely, Your Honor. And I'm mindful of that. But, again, that question is premised on the assumption that we have moved past the first prong of Strickland, and now we're examining any prejudice that might have flowed from the purportedly erroneous decisions of counsel. But I'll return to that in a moment, and I'll address the Court's question directly, which is, in the first place, if the Court were to read the declaration of Dr. Mungio that was given to Petitioner's counsel prior to the deposition. That's the 38 pages or whatever it is. Exactly so, Your Honor. If the Court were to read that, and that was the deposition or, excuse me, the declaration that was prepared in anticipation of the evidentiary hearing, and response to counsel's question, essentially, what is it we're going to be able to say about this guy that might be useful? I think it was probably as broad a question as that. If the Court were to read that declaration, nowhere in that declaration does Dr. Mungio actually diagnose Petitioner with anything. It wasn't until the deposition in response to a question, it was actually our question because we felt if there was going to be some sort of diagnosis that it would have put her, she would have put it in a report. And so we asked her, well, aren't you diagnosing him with something? Expecting the answer to be no. She said, oh, yes, of course I am. She never told them that. She never even mentioned it. So I think it's reasonable to say that if trial counsel had put the same question to Dr. Mungio that Petitioner's counsel put to Dr. Mungio, they would have received essentially the same response, and that response would not have included a diagnosis. So I don't think we can say with any degree of certainty that, again, we have to keep our focus carefully on the question of trial counsel. The question is not, and never has been, can we find a mental health professional willing to opine that Mr. Earp has brain damage? That's not the question. Or even whether Mr. Earp has brain damage.  I'm sorry, Your Honor. I was just going to say, but it seemed the supplemental excerpts of record on page 6, when they asked her, I'm asking you right now, you are now diagnosing Petitioner with a cognitive disorder, NOS, and she replies, correct. Correct. Yes. That was the first time in the history of this litigation from the time that he was arrested up until the time of that deposition, which I think was in 2004, 2005. I was in the room, but I don't remember exactly when it was. That anyone ever said that Mr. Earp has brain damage. Ever. But she did say it. Absolutely she did say it. But, again, let us turn our attention to what trial counsel should and could have done at the time of the trial. There's no reason to believe that she would have said that to trial counsel at the time of trial. Also, I have to take issue with some of the factual assertions that underlie some of the positions that Petitioner's counsel has taken. For example, they have said as a matter of fact that there was no neuropsychological evaluation of Mr. Earp done. They can't say that. They don't know that. We know that there were two psychologists that were retained. We also know that at least as to one of them, Dr. Gamson, that person was specifically told not to prepare a report because that report would not be useful for the defense, and they were afraid that if they got better information later, they would have to explain the earlier bad report. We have no report from Dr. Maloney. We have no – so we don't know what test Dr. Maloney gave. Well, one would assume based on the one comment that's attributed to Dr. Maloney that he would not have been a helpful expert. It's absolutely certain that he would not have been a helpful expert. My comment is directed at the question of whether neuropsychological testing was conducted in this case. But you're arguing that given what we do know that he said, that had he done such testing, it wouldn't have been favorable either, which would also explain why we never heard from Dr. Maloney at trial. That's correct. And we do know that a psychiatrist was hired and, again, Dr. Gamson and Dr. Maloney, both psychologists were hired. We don't know, for example, if there was a fourth expert. We just don't know. We don't know what materials Dr. Gamson, Dr. Maloney, and Dr. Coburn relied upon because they decided not to call those witnesses at the evidentiary hearing. They decided not to explore with the experts who were retained at the time of trial what tests were and were not done. They're now standing up here saying that just as a matter of fact, there was no neuropsychological testing. They can't say that. They're assuming that no testing was done because nobody ever said testing was done. But you do concede, do you not, that Judge Reel was incorrect when he said that only neuropsychiatrists could talk about brain damage, not neuropsychologists. I think that probably Judge Reel was relying too specifically and explicitly on the direction from this Court in that regard. When this Court remanded the matter for further evidentiary development on the question of organic brain damage, this Court said that it was interested in, and I'm quoting the Court, neurological and psychiatric evaluations. And I think that it probably, Judge Reel read that too closely, that neuropsychological evaluations might have, some neuropsychological evaluations might have shed some light on the question of organic brain damage. But again, we don't know that those weren't done by trial counsel here. We don't know that trial counsel didn't have a full neuropsychological workup of this person done and receive evidence that there was no organic brain damage. We just don't know. We don't know if in response to that message from Dr. Gamson that for the sake of completeness, let's look into organic brain damage, we don't know that they didn't follow that up. In fact, what evidence we do have tends to suggest that trial counsel did not simply accept Dr. Gamson's preliminary diagnosis of no organic brain damage because we have subsequent letters from trial counsel to other trial counsel where she's specifically discussing reviewing his medical records for the purpose of determining whether there was organic brain damage and coming to the conclusion that there wasn't anything in there that would have been useful in that regard. It's hard for me to imagine that if when they had originally come to this Court, Petitioner's counsel had said, rather than what they said, which led this Court to believe, and again, quoting from this Court's opinion, Earp alleges that his counsel failed to obtain a mental health, neurological, or psychological evaluation of Earp. That was how this Court was approaching the question of remand at the time the last decision was rendered. I think that if they had come to this Court and said instead, trial counsel was extremely mindful of the possibility of organic brain damage and, in fact, focused on that with a certain degree of intensity. Indeed, they consulted with three different experts, all of whom said there's no evidence of organic brain damage. Nevertheless, trial counsel was unsatisfied and she personally reviewed his medical files and she came to the independent determination that there was nothing that would support organic brain damage. In that context, however, Your Honor, we still think we need to go back and have further development on whether trial counsel inadequately investigated mental health evidence. I think that if when the full picture of what trial counsel did here, if that had been presented to this Court the first time, we would not have had a remand. I think this Court would have come to the conclusion that based upon what trial counsel actually did, no reasonable person could say that trial counsel did not thoroughly investigate the possibility of organic brain damage. What they want to do is two things. One is they want to assume no neuropsychological evaluation was done and they want neuropsychological evaluation to be read into Strickland very strictly, which is to say even if all your experts tell you there's none, you still have to thoroughly investigate it. And by that, we mean get a fourth expert to disagree with the first three so that we can keep going. And really, I can't see where that would necessarily end. Again, I am absolutely confident that as to any person on death row or any person anywhere, we could probably find some psychologist, neuropsychologist, psychiatrist somewhere who's willing to opine that person has brain damage. What they're going to say when you sit down is that they aren't asking for the fourth. They have in this record a person who says there's organic brain damage. I understand that, but my point is what is trial counsel supposed to do at the time of trial? I hire the first one. I hire the second one. I hire the third one. I get nothing. I have to keep going? At what point am I entitled, as Judge Tolman averred, at what point am I entitled to say not only am I not finding anything useful, everything that I'm finding tells me that this person is a sociopath who has a history or at least has a propensity to molest children. Probably this is not going to be a fruitful area for me to explore further. I'm going to devote myself to his background, to his family, which was the evidence that was presented. And I'd just like to very briefly touch upon those other two areas because they were overlooked by counsel in the discussion, which is the first thing that they said, or at least that this Court said, was that trial counsel failed to uncover extensive records of Irv's schooling. Well, we now know that's just not true. We now know that they did find all of his school records, even school records that we had thought were lost. They did. The mitigation investigator talked to his teachers. That was done. I mean, I think much of the problem that we're having in this case is that now that we've had an evidentiary hearing, we know that trial counsel did an absolutely exquisite job of investigating the case in mitigation. They really did everything that we can reasonably ask counsel to do. In fact, did more than it would be reasonable to set as the constitutional minimum. And nevertheless, we're finding ourselves arguing about whether or not, again, they should have hired a fourth expert, whether or not, not even should they have hired a fourth expert because we don't know that they didn't, but whether or not they should have. I mean, it's really, now it's ineffective assistance for failing to find and present this particular expert, because all we can say for sure is they didn't hire Dr. Mungia. That's all we can say for sure. But nonetheless, we asked Judge Reel to hear the testimony of Dr. Mungia and Mr. Taylor, and he didn't either. He heard but struck Dr. Mungia. It appears the question is now, do we need to remand so that he will follow what we asked him to do? I don't think that that's necessary, Your Honor, because I think that the evidence presented at the evidentiary hearing so clearly satisfies the first prong of Strickland, that moving on to the second prong of Strickland isn't going to be instructive. Under the first prong of Strickland, the question is, did trial counsel make a reasonable investigation? And as interpreted by the United States Supreme Court and by this Court, did they make decisions to not further investigate once those early investigations didn't bear fruit? In fact, the early investigations didn't bear fruit, and they continued to investigate organic brain damage. We have the note from Dr. Gamson that was in 1990 where he says, I don't find any indicators of any organic deficits, and we have a letter to file or a letter to counsel that was in the file from Ms. Dell, where she was continuing to examine the question of organic brain damage a year later. Now, but we had that information before us, before we remanded. I'm not sure that this Court did have that information before it when we remanded. Indeed, I think that he had gone to three mental health experts. No, because, again, I would point out that this Court's original order was predicated upon Petitioner's allegation that there was, that counsel failed to obtain a mental health evaluation. That was this Court's apprehension at the time that the original remand order was entered. Well, that's just not true. No person, Mr. Gerstein is not going to come back up here in response to me and say, that's correct, Your Honor, counsel failed to obtain a mental health investigation. What he's going to say is counsel failed to obtain a complete mental health investigation because in addition to the two psychologists, the psychiatrists, and whatever other experts may or may not have been contacted, we don't know, he should have hired this particular expert in addition. I mean, I would point, I'm sorry. Go ahead. I would point to this Court's decision in Sims where this Court said that relying on Dr. Michael Maloney's opinion that there's no organic brain damage excused counsel from failing to look further into the question of organic brain damage. It's hard for me to find a case that's more on point than that usually. So it's, again, I understand and I appreciate the Court's frustration with Judge Reel's reaction to Dr. Mungio's testimony, but that was done in the context of the Court already having heard how thoroughgoing the original investigation was. And the Court could come to the conclusion that I don't need to hear Dr. Mungio because I already know that trial counsel did a perfectly good job here. I can't get to the question of prejudice because trial counsel's investigation was, absolutely was, reasonable, in fact, was more than reasonable. And once we've answered that question, the prejudice question evaporates. Well, what bothers me is that the penalty phase, had her testimony come in under the pinholster case, one juror listening to that could have been affected, and that's the difference between life and death for Mr. Earp. And when we asked him to take that testimony, and he did not, the question is, should we ask him or some other judge to take that testimony? I don't think that's necessary, Your Honor, for a couple of reasons. One is, as I said, one doesn't move to the prejudice analysis without first going through the gateway of the representation question, the reasonableness of the representation question. Further, in the context of this particular case, again, what we're going to have is we're going to have Dr. Mungio. Assuming that Dr. Mungio's testimony, and if this Court wishes to look at Dr. Mungio's testimony, I think that that would be probably prudentially appropriate in terms of the conservation of resources. Look at that and read all that she has to say. Read the cross-examination that Mr. Carlin and I did of that witness. I think that, and again, you have to weigh that in the context of the terrible crime that occurred in this case. There's no reasonable probability that even a single juror was going to be swayed, particularly because, as Judge Ferris was saying earlier, a case trying to erect a brain damage mitigation case, even following pinholster, is not going to be particularly effective unless you're saying, yes, I did it, but you have to understand why. This explains why you do the terrible crime. But that wasn't the mitigation case that they were trying to build. They were trying to build a case, and there's a memo to file by Ms. Dell here where she says that's not going to be an effective strategy. The effective strategy is going to be to try to build sympathy for him by putting his family members on, that once you become convinced that he did a crime that's as awful as this crime is, it's extremely unlikely that any juror is going to say, oh, well, I didn't know that he hit his head when he was a kid and smoked a lot of pot down by the river. Oh, I guess it's not as bad as I thought it was. It's just it's not a particularly significant piece of evidence in mitigation. And so trial counsel would be and was entitled to go in a different direction. And if you're not going to admit responsibility, explaining why you didn't do why you have a brain problem that has nothing to do with the crime is a pretty weak read to say that even a single juror would be swayed. Was that your argument in Pinholster? I'm not done arguing Pinholster yet. Thank you, Nelson. Before you sit down, we're going to hear a rebuttal. Would you as succinctly as you can give us maybe in a paragraph or less the posture of this case as you see it that is before us right now from your perspective? My perspective, this court remanded for the purpose of determining whether trial counsel did a reasonable investigation. And if that investigation was unreasonably curtailed, what would be the consequence of that? Given the breadth and depth of the investigation that was undertaken and completed in this case, trial counsel's conduct cannot fairly be criticized. And therefore, it cannot be concluded that under Strickland v. Washington that trial counsel provided incompetent representation. Does that answer the Court's question? Yes. Does the Court have any further questions? I think not. Thank you very much. There are lots of ways you can use your time, but you may want to go straight to the paragraph that he just gave us and tell us why he's wrong. Well, Your Honor, first of all, because as Judge Nelson pointed out earlier, we have here a context failure to hear, to have the hearing that this Court ordered, which does not require harmless error analysis. But he did. I mean, you called eight witnesses and the State called three. Yes. And we're talking about one witness whose testimony was stricken. What about the other seven or the other ten? Well, Your Honor, first of all, that witness was a critical witness, a witness which was extensively discussed in this Court's opinion. Secondly, as we have pointed out, there were, with regard to the testimony of the other witnesses, there were a great many instances in which specific objections were sustained for no good reason and there was not really a full hearing of the testimony. Now, if we do look at the question of harmless error here, if assuming that we're not contending that that is appropriate, we don't think it's appropriate in the first instance, we think you remand to a new judge in order to have a real, full, fair hearing. A real, full, fair hearing on what point? Certainly on the ineffectiveness of trial counsel at the penalty phase. And as to that, I understand how you read this record and you say counsel was ineffective. Yes. But an objective reading of the record could very well have someone conclude that counsel was not ineffective. That might be the case, Your Honor, but that analysis has not been appropriately done on the basis of a full hearing of the evidence. And I would point out that counsel was saying, well, you don't – first you look at the reasonableness of the performance, and then you look at what was found later, and that's relevant to prejudice. But that is not what we're seeing. But, Mr. Gerstein, what I hear you saying is that the judge should have permitted more testimony about evidence that he found to be cumulative. I mean, there was a lot of testimony at the hearing about the investigation that Ms. Duvall did into the background, the three mental health professionals, the friends and family members who were contacted. Besides Mungillo, what area do you think was improperly terminated? Well, first of all, with regard to Mungillo, Your Honor, I said that – No, no.  Besides Mungillo, what other areas – Nothing was terminated, but there was a great deal to – for example, with regard to drug use, the witnesses were allowed to testify that they saw Petitioner using drugs at an early age, in the junior high and high school period, starting at age 12. But when they were asked questions about the extensiveness of that use, objections were sustained for irrelevance. Now, that's the kind of thing I'm talking about. He simply hamstrung the Petitioner's case at every point. Again, questions were asked of Morrissey as to whether her investigation was complete, as to whether she felt there should be further investigation of organic brain damage. Once again, objections were sustained to that testimony. Again and again, throughout the record, we find that disposition by this district judge not to hear the full case. Now, in addition, I just wanted to make the point – Mr. Gershengorn, I'd let you go over it. I'll give you about 30 seconds to wrap it up, but you're out of time. All right. Thank you, Your Honor. Just one point. The Wiggins case says that you judge ineffectiveness in light of what counsel actually discovered, that you judge the reasonableness of the investigation in light of what counsel actually discovered in the habeas investigation. So that's not irrelevant to that first strand of Strickland. Wiggins says that it's entirely relevant. Your Honor, once again, I would say you simply cannot accept the idea of sending a man to his death on the basis of this kind of a hearing. This must be remanded and remanded to a new judge. Thank you, Your Honor. Thank you, Mr. Gershengorn. I thank both counsel for your excellent arguments. The matter is under submission, and we'll get an answer to you as soon as we can. Court is adjourned.
judges: Farris, Nelson D. W., Tallman